IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ANTHONY MARTIN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No.:   4:17-CV-00142 |
| THE CINCINNATI INSURANCE CO. | ) ) **JURY TRIAL DEMANDED** |
| Defendant. | ) ) |

## PLAINTIFF'S MOTION TO COMPEL

COMES NOW Plaintiff, Anthony Martin, by and through counsel, Sauter Sullivan, LLC, and moves this Court for an order requiring Defendant, The Cincinnati Insurance Co., to provide full and complete responses to certain discovery requests and produce all responsive documents such that Plaintiff can continue to prepare this case for trial. Plaintiff's Certification of Attempt to Resolve is attached hereto as Exhibit A.

### FACTUAL BACKGROUND

This case arises out of a highway crash on Highway 170 in St. Louis County, Missouri back on September 15, 2015. Plaintiff Martin was driving a van when his van was hit by another vehicle that came in to Plaintiff's lane causing his van to rollover and leave the roadway. There were witnesses to the collision that confirmed the crash was caused by the vehicle that came in to Plaintiff's lane. Unfortunately, the vehicle that caused the crash fled the scene and could not be identified.

Plaintiff Martin was extricated from his van and taken by ambulance to the hospital. He had multiple fractures in his spine and has a permanent spinal cord injury. He has incurred medical expenses to date of over $60,000. Plaintiff was a union commercial electrician for many

1

years prior to the crash. His job as a union electrician requires overhead work (running ceiling wire, installing conduit, wiring ceiling fixtures, etc.) on a regular basis. Due to his injuries, Plaintiff is unable to do overhead work for more than an hour at a time without getting headaches and he has been given permanent work restrictions from both his treating doctor and Defendant's IME doctor that prohibit him from being hired as, and doing the required work of, a union commercial electrician. Plaintiff is 42 years old and has not been able to work as a union electrician for over 2 years. His past and future wage loss is significant.

Defendant Cincinnati Insurance Co. issued an insurance policy providing $1 Million in uninsured motorist benefits to Plaintiff Martin. The uninsured motorist coverage was triggered by virtue of the fact that the driver that caused the collision fled the scene and could not be identified. There is absolutely no dispute in this case that: (i) Plaintiff is Defendant's customer and insured under the Cincinnati Insurance policy, and (ii) Plaintiff is entitled to receive uninsured motorist benefits under the insurance policy.

In August 2016, Plaintiff requested that Defendant pay him the uninsured motorist benefits due under the policy. Despite the passage of over a year since Plaintiff's request for payment of the uninsured motorist benefits to which he is entitled, Defendant has failed to make any payment to Plaintiff. When Defendant failed and refused to pay Plaintiff any amount of uninsured motorist benefits under the policy, Plaintiff filed this action on January 10, 2017. A First Amended Complaint was filed on March 29, 2017. In Count I of the First Amended Complaint, Plaintiff asserts that Defendant Cincinnati Insurance has breached the insurance contract by failing to pay Plaintiff the benefits to which he is entitled to under the insurance policy. In Count II, Plaintiff asserts that Defendant's failure to pay him any benefits under the policy (currently over 2 plus years

since the crash) is vexatious under R.S.Mo. §375.296 such that Plaintiff is now also entitled to attorneys' fees and penalties.

## VEXATIOUS REFUSAL

Under Missouri law, if the jury determines that Defendant Cincinnati Insurance failed to pay Plaintiff's claim under the insurance contract within 30 days of Plaintiff's request for payment, and the refusal to pay was "vexatious and without reasonable cause", Plaintiff is entitled to statutory vexatious refusal penalties and attorneys' fees. R.S.Mo. §375.296. Specifically, R.S.Mo. §375.296 provides that the statutory penalties and attorneys' fees are available "if the insurer has failed or refused for a period of thirty days after due demand therefore prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause . . .". "In Missouri, vexatious refusal to pay requires Plaintiff to prove there's an insurance policy, the insurer refuses to pay and the insurer's refusal was without reasonable cause or excuse." Smith v. Zurich Am. Ins. Co., 2017 U.S.Dist. LEXIS 116796 (E.D. Mo., July 26, 2017).

In this case, within a day or so after the September 17, 2015 crash, Plaintiff's claim was reported to Defendant Cincinnati Insurance. The claim was assigned to Cincinnati Insurance adjuster Chad Huebner. Mr. Huebner was designated by Defendant as its corporate representative to testify in this case and he was recently deposed on September 28, 2017. Excerpts from the deposition of Mr. Huebner are attached hereto as Exhibit B.

Within a few weeks after receipt of the claim and after conducting his investigation, Mr. Huebner, on behalf of Cincinnati Insurance, determined that Plaintiff was an insured under the

3

policy and that Plaintiff was entitled to receive uninsured motorist benefits under the policy. In fact, as Defendant's designated corporate representative to testify about Plaintiff's claim, Mr. Huebner admits and acknowledges that the company concluded well over a year ago that the company owed Plaintiff some amount of uninsured motorist benefits under the policy for Plaintiff's "compensatory damages" arising out of the car accident. Specifically, he testified:

> Q: I don't think there's a dispute the policy limit for Tony's claim is $1 million?
> A: One million dollars.
> Q: And there is any dispute in this case that Tony's covered under the Policy?
> A: There's no dispute.
> Q: Is there any dispute that Tony's entitled to uninsured motorist benefits?
> A: There's no dispute about that.
> Q: Is there any, do you have any evidence or is there any allegations that Tony did anything at all to cause or contribute to cause this accident.
> A: Absolutely not.
> Q: So as you sit here today as the corporate representative, two years have gone by since the crash?
> A: Yes.
> Q: And Cincinnati Insurance Company determined a long time ago that Tony was covered, he was entitled to receive uninsured motorist benefits, right?
> A: Yes.
> Q: And you've known that for a long, long time, right?
> A: Yes.
> Q: And Cincinnati Insurance has concluded that we owe him some sort of uninsured motorist benefits, right?
> A: Yes.
> Q: Whether it be $80,000 or $180,000, whatever it is, but Cincinnati Insurance has concluded we owe Tony uninsured motorist benefits?
> A: Yes.
> Q: There's no dispute over that?
> A: There's no dispute.
> Q: An amount is owed to Tony Martin for insured motorist benefits under the policy?
> A: That's correct. Huebner Deposition, pp. 72-74.

4

A copy of the uninsured motorist portion of the policy is attached hereto as <u>Exhibit C</u>. As the Court can see, the policy requires Cincinnati Insurance to pay all of the insured's "compensatory damages" which the customer/insured is entitled to recover from the uninsured driver that caused the crash. There is no time frame set forth in the policy for payment of the benefits. However, as indicated above, there is a time limit of 30 days set forth in R.S.Mo. §375.296. Regardless, Mr. Huebner admits that the policy requires Cincinnati Insurance to pay all "compensatory damages" that Plaintiff has sustained. <u>Huebner Deposition</u>, pp. 67-69.

Mr. Huebner acknowledges that it is the Cincinnati Insurance adjuster's job to come up with the amount of uninsured motorist benefits that Defendant owes its insured/customer under the policy. He testified:

> Q: So do you actually come up with a value for the particular claim?
> A: Yes.
> Q: That's part of your job as an adjuster to figure out what the value of this uninsured motorist claim is?
> A: Correct. Yes
> Q: Part of your job is to determine what do we owe our customer under this policy for the claim?
> A: Correct.
> Q: And that's something that you do on a regular basis?
> A: Yes. <u>Huebner Deposition</u>, p. 29.

After Cincinnati determines the amount owed to its customer, that amount is then recorded in the claim file.

> Q: After you come up with a value of what you believe Cincinnati Insurance owes their customer on an uninsured motorist claim, do you record that value in your system somewhere?
> A: Yes, we would put notes, for the information we have at this time we believe the value of this claim is between X amount of dollars and X amount of dollars.
> Q: So you record somewhere in your system that based upon the

5

>   information that we have we believe that we owe our customer between X and Y for this particular claim.
> 
> A:   Yes.
> 
> Q:   That's fair, I guess what I'm getting at, so in order to determine what Cincinnati Insurance believes is the value of this person's uninsured motorist claim you go to this area in the file where you records this figure, is that correct?
> 
> A:   That's correct. <u>Huebner Deposition</u>, pp. 30-31.

After Cincinnati Insurance determines that a customer is entitled to uninsured motorist benefits and determines and records how much the company believes is owed to its insured/customer, instead of paying the customer the amount Cincinnati believes is owed, the company "offers" some amount but will not pay the amount offered unless and until: (i) the customer agrees with the Cincinnati Insurance figure, (ii) the customer signs a settlement agreement, and (iii) the customer signs a release of any further claims for benefits. Specifically, Mr. Huebner testified:

>   Q:   If you conclude that this person's claim is worth $25,000 do you send a check?
>   A:   No.
>   Q:   Why not?
>   A:   We have to get a settlement first and a release.
>   Q:   So you never send a check until you have a settlement agreement and a release?
>   A:   That's correct.
>   Q:   Is that in all cases, every uninsured motorist claim that Cincinnati has, you don't pay the claim until you get a settlement agreement and a release, is that right?
>   A:   I believe that is with any insurance company.
>   Q:   That's Cincinnati's policy, right?
>   A:   Yes.
>   Q:   And that's your testimony as the corporate representative?
>   A:   Yes.
>   Q:   Cincinnati never pays somebody uninsured motorist benefits unless they have a settlement agreement and a release, is that correct?

6

| | |
|---|---|
| A: | That's correct. |
| Q: | Okay. Just so I'm clear here. It's Cincinnati Insurance Company's policy that they will not pay their customer any uninsured motorist benefits until that customer agrees with the figure, is that accurate? |
| A: | That's correct, yes. |
| Q: | So the customer has to agree with Cincinnati's figure before they're going to get paid? |
| A: | Yes, sir. |
| Q: | And until Tony agrees to Cincinnati's figure, agrees to sign a release and agrees to enter into a settlement agreement Cincinnati Insurance has no obligation to pay him a dime, correct? |
| A: | No. |
| Q: | Is that correct, is my statement correct? |
| A: | Yes, your statement's correct.  Huebner Deposition, pp. 40-41, 44 & 76-77. |

Despite this admitted policy and practice by Defendant, there is absolutely nothing in the insurance policy which provides that the contractual obligation to pay out the amount of uninsured motorist benefits that Cincinnati Insurance determines is owed to its customer is contingent on the customer agreeing with Defendant's figure, signing a settlement agreement and agreeing to release any further claims for benefits.  Mr. Huebner readily admits that the policy has no such requirements.

| | |
|---|---|
| Q: | Does this insurance policy, the uninsured motorist policy, does that state anywhere that Cincinnati Insurance does not have to pay uninsured motorist benefits to its customer until that customer agrees with Cincinnati's figure? |
| A: | Again, I don't know if that's stated in the policy or not. |
| Q: | Have you ever seen the policy? |
| A: | Yes. |
| Q: | (By Mr. Sullivan) Let me hand you Mr. Huebner, I hand you what we've marked as Exhibit 3.  Is that the policy you're talking about, the uninsured motorist benefits? |
| A: | Yes. Missouri uninsured motorist benefits. |
| Q: | That's a policy you're familiar with, right? |
| A: | Yep. |
| Q: | It's four pages, right? |

7

A: Yes.
Q: And do you understand that you have been designated as Cincinnati Insurance's corporate representative to talk to us about topic number 5, defendant's obligations to plaintiff under the subject insurance policy and defendant's compliance with those obligations.
Q: Do you understand that?
A: Yes.
Q: (By Mr. Sullivan) To put it in context here's my question:  Is there anything in the Cincinnati insurance policy that states that Cincinnati does not have any obligation to pay uninsured motorist benefits to its customer unless and until its customer agrees with Cincinnati's figure?
A: (Reviewing document).  I did not see anything in here that states that their release is needed.
Q: Is there anything in the policy, Cincinnati's insurance policy, that states that Cincinnati has no obligation to pay uninsured motorist benefits to its customer unless and until its customer signs a settlement agreement?
A: I do not see anything in there.
Q: Is there anything in Cincinnati's insurance policy that states that it has no obligation to pay its customers uninsured motorist benefits unless and until the customer signs a release and agrees that it won't seek anything further from Cincinnati Insurance?
A: Again, I think we're asking the same question but I don't see it in the policy.  Huebner Deposition, pp. 44-47.

Along with a letter dated August 16, 2016 (well over a year ago), Defendant was provided with Plaintiff's medical records and bills, as well as all the other materials necessary to make a determination regarding the amount of benefits owed to Plaintiff under Defendant's insurance policy. Huebner Deposition, p. 47. In the August 16, 2016 letter, Plaintiff requested that Defendant pay the uninsured motorist benefits owed under the policy. Mr. Huebner tells us that in August, 2016, upon review of the materials submitted by Plaintiff, he immediately concluded that the value of Plaintiff's claim exceeded $100,000 (the extent of his authority). Huebner Deposition, pp. 50-51. He then contacted his supervisor and told him that the value of the claim

exceeded $100,000 and transferred the claim to the home office. Huebner Deposition, pp. 50-51. Instead of paying Plaintiff the value of his claim which Cincinnati Insurance had concluded in August 2016 was in excess of $100,000, in November, 2016 (2 months later) Defendant "offered" Plaintiff $80,000 for his claim, but only if he agreed with that figure and only if he would sign a settlement agreement and release. Huebner Deposition, pp. 53-55.

To date, it is undisputed that Defendant has not paid Plaintiff anything despite repeated requests for payment.

> Q: Okay. So since the time in August of 2016 when you, the person handling this claim, concluded that the claim or the amount owed to Tony was in excess of $100,000, since that time in the year plus that has gone by has Cincinnati paid Tony a penny for his uninsured motorist claim?
> A: No. Huebner Deposition, p. 56,

Mr. Huebner readily admits that until Plaintiff folds and accepts Defendant's figure as to the amount of benefits owed to Plaintiff (or goes through the litigation process and gets a verdict), Cincinnati Insurance will withhold even the amount of Plaintiff's benefits that Cincinnati Insurance acknowledges is owed to Plaintiff.

> Q: Right. At the end of the day you're not going to pay Mr. Martin or anybody else, any of your customers a penny until they agree with you as to what the value of the claim is, right?
> A: Right. That's correct.
> Q: So even if you think the claim is worth $100,000 until they agree with you you're not going to give them the $100,000 that you believe the claim is worth, correct?
> A: That is correct. Huebner Deposition, pp. 82-83.

9

## DISCOVERY REQUESTS

The fundamental issue in this vexatious refusal case is whether the failure and refusal of Cincinnati Insurance to pay Plaintiff even the amount of benefits that Defendant believes it owes to Plaintiff is "without just cause or excuse". If the failure to do so is in fact "without just cause or excuse" then Plaintiff is entitled to statutory vexatious refusal penalties and attorneys' fees in addition to the uninsured motorist benefits which Defendant has been holding on to for over 2 years now. Defendant asserts that it has no obligation under its policy to pay any benefits to Plaintiff unless and until: (i) Plaintiff agrees with the Cincinnati Insurance figure, (ii) Plaintiff signs a settlement agreement, and (iii) Plaintiff signs a release of any further claims for benefits. According to Defendant, it is "excused" or has "just cause" for not paying Plaintiff because it has "offered" Plaintiff the amount of benefits it believes are owed under the policy. Defendant argues that it is justified in not paying the figure "offered", or frankly any benefits to Plaintiff, because Plaintiff will not agree to the figure and sign a release. Plaintiff believes that the real reason Defendant refuses to pay its insured/customer any benefits until the customer agrees with Defendant's figure is to exert pressure on a customer (who is be injured, out of work and faced with medical bills) to just give up and take a low ball offer because the customer needs the money. The true reasons and basis for the ongoing failure of Defendant to pay Plaintiff's benefits under the policy are directly relevant to whether the failure to do so is without just cause or excuse. The motivation and strategy behind the decision not to pay Plaintiff's benefits is also directly relevant.

As set forth above, there is evidence in this case that Defendant undertakes to come up with the value of its customer's claim and then offers that amount to its customer in exchange for a settlement agreement and release thus, in Defendant's mind, creating just cause or excuse for not paying Plaintiff benefits when Plaintiff will not accept that amount. Of course, as Mr. Huebner the

10

corporate representative has already admitted, what happened in this case was that Cincinnati Insurance determined that the amount owed to Plaintiff was actually in excess of $100,000 and then 2 months later "offered" him $80,000, but would only pay him this amount if Plaintiff gave up his claim. It is difficult to understand how anybody could conclude that this conduct is not vexatious. Plaintiff believes that Cincinnati Insurance has a policy and practice of determining how much is owed to its customer and then turning around and offering to pay something less than it owes. Worse than that, Cincinnati takes the position with its customers that it has no obligation under the policy to pay the customer anything until the customer agrees with Defendant's figure and agrees to sign a settlement agreement and release. Putting aside the fact that the policy has no such requirements, one wonders how many people over the years just accepted what they were told by Cincinnati Insurance and gave up and took the money offered because they needed it or were not willing or able to go through the litigation process. Regardless, the above demonstrates that the Defendant's determination as to the value of Plaintiff's claim, the process of making that determination and the basis for the amounts offered to Plaintiff are now directly relevant to Plaintiff's vexatious refusal claim and Defendant's defense to that claim.

Plaintiff served a Request for Production of Documents and First Interrogatories on Defendant. The Request for Production is attached hereto as <u>Exhibit D</u> and the First Interrogatories are attached as <u>Exhibit E</u>. Defendant's Objections and Responses to Plaintiff's Request for Production and its Objections and Answers to Plaintiff's First Interrogatories are attached hereto as <u>Exhibit F</u> and <u>Exhibit G</u>, respectively.

Federal Rule of Civil Procedure 26(b)(1) governs the discovery sought by Plaintiff. The relevancy standard is broad and routinely applied by this Court when insurance claim file materials are sought. <u>Mills v. Liberty Mutual Ins. Co.</u>, 2017 U.S.Dist LEXIS 62629; 2017 WL 1497904

11

(E.D.Mo. April 24, 2017). The Court has further recognized that an uninsured motorist claim file belongs to the insured. Am. Modern Home Ins. Co. v. Thomas, 2017 U.S.Dist. LEXIS 146395 (E.D.Mo. September 11, 2017).

The discovery propounded on Defendant is geared toward obtaining information and documents which may lead to the discovery of admissible evidence on the basis, reasons for and motivation behind Defendant's decision not to pay Plaintiff the amount that it acknowledges is owed. Specifically, Request Nos. 11-12 request the claim file materials and Request No. 13 asks for any documents reviewed or relied upon by Cincinnati Insurance in conjunction with its decision not to pay Plaintiff's claim. Request No. 20 seeks reports, notes, emails and other written communications between Cincinnati employees about Plaintiff's claim and Request No. 14 seeks reports, emails and other documents which relate to the evaluation or status of Plaintiff's claim.

In response to these document requests, Defendant uniformly objects to each request on the basis of relevance, the attorney-client privilege and the work-product privilege. The responses go on to say that Defendant is producing some portion of a redacted claim file, without any further explanation. No information is provided as to what portions of the claim file have been produced or for what period of time. Plaintiff learned at the deposition of Mr. Huebner that no portions of the claim file or any other documents were produced for the period after August 30, 2016 with regard to the decision not to pay the claim despite the fact that the claim remains unpaid. There is no privilege log. There is no discussion of how, when or why certain materials are "work-product" or otherwise protected from disclosure. From the response, it is impossible to even determine whether Defendant looked for and considered documents which are not part of the claim file. For example, the requests seek emails between Defendant's adjusters about Plaintiff's claim and documents which were reviewed or relied upon in conjunction with the decision not to pay the

claim. Plaintiff is entitled to responsive documents regardless of whether they were made part of what Defendant considers its claim file. In short, given these responses and the failure to clearly identify all responsive documents which are or are not being produced, there is no way for this Court to assess whether something not being produced is truly an attorney-client communication or something that meets the requirements of the work-product doctrine.

As this Court has recognized, "[T]here often is substantial need for discovery of information in a claims file as it relates to a claim of vexatious refusal to pay." Am.Modern Home Ins. Co. v. Thomas, 2017 U.S.Dist. LEXIS (E.D.Mo. September 11, 2017). Further, "allowing a plaintiff to overcome an insurer's work product privilege may be particularly appropriate in an action for bad faith, in light of the insurer's virtual monopoly over the evidence required to support an action." Id. "The substantial need arises because the strategy, mental impressions and opinion of the insurer's agents concerning the handling of a claim are directly at issue." Id. This sentiment could not be more appropriate or applicable to this case where the basis for, strategy and motivation behind failing to pay Plaintiff the amount owed and behind the figure "offered" to Plaintiff are directly at issue. Moreover, all the evidence regarding why Defendant has failed to pay Plaintiff's claim is in the possession of the Defendant. Defendant should not be allowed to pick and choose portions of its files which support Defendant's proffered justification for failing to pay Plaintiff, while withholding other documents which may shed light on Defendant's real strategy and motivation for the ridiculous handling of Plaintiff's claim.

Additionally, the discovery also seeks information and documents which may lead to the discovery of admissible evidence related to Defendant's valuation of Plaintiff's claim and the basis for that valuation. Specifically, Interrogatory No. 9 requests disclosure of Defendant's reserve amounts for Plaintiff's claim and Request No. 6 seeks documents which set forth reserves set by Cincinnati Insurance for Plaintiff's claim. Of course, the reserves set by Defendant would be

relevant to Defendant's determination as to the amount which it believes is or might be owed to its insured.  As to these discovery requests, Defendant asserts the same relevance, work-product and attorney-client privilege objections without any explanation, without a privilege log and without producing any documents or providing the requested information.  Defendant should be ordered to disclose the amount of the reserves set on the claim, when these reserves were set, whether these reserves changed and, if so, when they changed.  Defendant should also be required to produce any documents which discuss the reserves, including documents setting forth the calculation of the reserves and the basis or justification for the reserve amounts.  If the reserve amounts and other evidence of the amount which Defendant concluded it owed Plaintiff under the policy turn out to be higher than the $80,000 amount "offered" to Plaintiff in exchange for a settlement agreement and release, this would be evidence that Defendant's failure to pay Plaintiff's claim is vexatious.

Finally, Request No. 17 seeks production of manuals, policies and procedures used by Cincinnati Insurance adjusters in handling and evaluating uninsured motorist claims.  Similarly, Request No. 18 seeks any Cincinnati Insurance policies, procedures or guidelines reviewed or relied upon by Cincinnati Insurance in conjunction with its decision not to pay Plaintiff's claim.  Of course, given Defendant's failure to pay the claim and its explanation for failing to do so, these materials may be admissible or lead to the discovery of admissible evidence and should be produced.  Mills at 9-10.

RELIEF REQUESTED

Plaintiff requests that this Court enter an Order requiring Defendant Cincinnati Insurance to produce all documents responsive to Request Nos. 11 – 14 & 17 – 20.  In the event that there are documents which Defendant is withholding from production on the basis of privilege, Defendant should be required to list those documents on a privilege log and produce them to the Court for an in

camera review to evaluate Defendant's claim of privilege. Plaintiff further requests that the Order provide that Defendant will file a supplemental response to the above-referenced requests confirming that <u>all</u> responsive documents have either been produced or listed on the privilege log. As to Interrogatory No. 9 and Request No. 6, Plaintiff requests that the Court enter an Order requiring Plaintiff to file supplemental responses, without objections, and produce all responsive documents.

SAUTER SULLIVAN, LLC

By: /s/ Kevin A. Sullivan
Kevin A. Sullivan, #40735
Attorneys for Plaintiff
3415 Hampton Avenue
St. Louis, MO 63139
Tel: 314-768-6800
Fax: 314-781-2726
E-mail: ksullivan@ss-law.net

**CERTIFICATE OF SERVICE**

A copy of the foregoing Plaintiff's Motion to Compel was sent via electronic mail and First Class United States Mail, postage pre-paid this 7th  day of November, 2017 to:

David P. Bub
Jennine D. Adamek Moore
Brown & James, P.C.
800 Market Street, Suite 1100
St. Louis, MO  63101-2501
dbub@bjpc.com
jadamek@bjpc.com

*Attorneys for Defendant*

/s/ Kevin A. Sullivan

15